UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNSAUCE FOODS INDUSTRIAL CORP., LTD,<br><br>Plaintiff,<br><br>v.<br><br>SON FISH SAUCE USA CORPORATION,<br><br>Defendant. | Case No. 5:22-cv-08973-PCP<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 66, 74 |

Plaintiff Sunsauce Foods Industrial Corporation ("Sunsauce") brings this trademark infringement action against defendant Son Fish Sauce USA Corporation ("Son Fish Sauce"). Son Fish Sauce asserts counterclaims against Sunsauce challenging the validity of its trademark registration. The parties have filed cross-motions for summary judgment. For the following reasons, the Court grants Son Fish Sauce's motion for summary judgment as to Sunsauce's claims, denies Son Fish Sauce's motion as to its counterclaims, and denies Sunsauce's motion for summary judgment.[1]

## BACKGROUND

Sunsauce is a Thailand-based company that produces and sells Thai-style sauces and related food products. Son Fish Sauce is a California-based company that produces and sells fish sauce in the United States. Sunsauce alleges that Son Fish's "SON SAUCE" mark is likely to

---

[1] The Court also denies without prejudice Son Fish Sauce's motion in limine to exclude the expert testimony and report of Erik M. Pelton. Dkt. No. 68. While Mr. Pelton's testimony and report consist almost entirely of impermissible legal opinions, the Court will accord it the minimal weight it is due in resolving the parties' cross-motions and will consider the rebuttal expert report of Amanda V. Dwight, Dkt. No. 68-3, accordingly. Should Sunsauce seek to offer Mr. Pelton's expert testimony in any future proceedings in this matter, Son Fish Sauce may file a renewed motion to strike or exclude Mr. Pelton's testimony.

1  cause confusion among consumers given Sunsauce's existing "SUNSAUCE" composite mark,
2  which was registered with the USPTO under Section 44(e) in July 2013 in connection with sauces
3  and related food products (Reg. No. 4,363,095) ("'095 Registration").

4  Several years after Sunsauce registered its mark with USPTO, Son Fish Sauce applied for a
5  trademark for its SON SAUCE mark (both in word and design form). Its application was denied in
6  2020 based on the USPTO's finding of a likelihood of confusion with Sunsauce's SUNSAUCE
7  mark. Son Fish thereafter filed a petition with the Trademark Trial and Appeal Board in June 2022
8  seeking to cancel Sunsauce's trademark registration on the ground that Sunsauce had either
9  abandoned its mark or failed to adequately use it in the United States.

10  Sunsauce filed this lawsuit on December 19, 2022, asserting a trademark infringement
11  claim under the Lanham Act, 15 U.S.C. § 1114; a common law trademark infringement claim; a
12  claim for unfair competition under California's Unfair Competition Law, Cal. Bus. & Prof. Code §
13  17200; and a claim for unfair competition under Section 43 of the Lanham Act, 15 U.S.C. §
14  1125(a).

15  Son Fish Sauce asserted counterclaims against Sunsauce seeking cancellation of the '095
16  Registration under 15 U.S.C. § 1064, a declaration that the '095 Registration is invalid, and a
17  declaration that Son Fish Sauce's mark does not infringe the '095 Registration or any common law
18  rights Sunsauce has in its mark. Son Fish Sauce alleges that Sunsauce's registration is void ab
19  initio because, at the time of its trademark application, Sunsauce lacked a bona fide intent to use
20  its mark in commerce. Son Fish Sauce also alleges that Sunsauce's registration should be
21  cancelled because Sunsauce fraudulently misrepresented its products' use in commerce in its 2019
22  Declaration of Use and Incontestability.

23  Son Fish Sauce has moved for summary judgment on all claims and counterclaims and
24  Sunsauce has moved for summary judgment on all claims.

25  **UNDISPUTED FACTS**

26  The following facts are undisputed on the record before the Court except as specifically
27  noted.

28  Sunsauce did not directly sell any of its products in the U.S. before 2019, although it was

2

aware that at least one third party resold its products in the U.S. as of 2015. Dkt. No. 74-7, at 3; Dkt. No. 74-4; Dkt. No. 74-5. On its 2019 Declaration of Use and Incontestability, Sunsauce stated that its mark was used on several different sauces, including fish sauce, that it did not directly sell in the U.S. at that time. *See* Dkt. No. 66, at 26–27; Dkt. No. 77, at 7–8. Sunsauce did not begin selling fish sauce in the U.S until December 2022. Dkt. No. 66-3, at 9–10. In March 2023, Sunsauce deleted fish sauce, along with several other sauces, from its registration. Dkt. No. 76, at 11; Dkt. No. 77, at 8.

From 2019 to 2023, Sunsauce's total U.S. sales amounted to less than $5,000. Dkt. No. 66-3, at 7–8; Dkt. No. 74-4.[2] *See* Dkt. No. 1-1. Sunsauce's total U.S. sales of fish sauce as of 2023 consisted of two boxes of twelve bottles each between 2022 and 2023. Dkt. No. 66-3, at 9. Sunsauce has introduced no evidence of any marketing or advertising in the U.S. at the time of its trademark application. Sunsauce's total advertising and marketing expenditures in the U.S. between 2013 and 2023 were $272.28. Dkt. No. 66-4, at 3. During that period, Sunsauce attended no trade shows in the U.S. Dkt. 66-3, at 13. In 2024, Sunsauce attended its first U.S. tradeshow. *Id.* at 14. Sunsauce has introduced no evidence that it has offices or employees in the U.S. or contracts or agreements with any U.S. retailers to sell its products in the U.S. Sunsauce has also produced no evidence of actual consumer confusion with respect to the parties' products. *See* Dkt. No. 66-3, at 16.

## LEGAL STANDARDS

Under the Federal Rules of Civil Procedure, a Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court's function on a summary

---

[2] Sunsauce contends that its total U.S. sales revenue between 2019 and 2023 was $4,592.10. Dkt. No. 66-3, at 7–8. Son Fish Sauce disputes that figure as reflecting sales made to a Thai distribution company that may or may not have sold the products it purchased to consumers in the U.S. Dkt. No. 76, at 9.

3

judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence and inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Id.* at 631. The moving party may submit affidavits to support a Rule 56 motion for summary judgment. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* at 587.

To prevail on a trademark infringement claim, a plaintiff must "prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1144 (9th Cir. 2011) (quoting *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)).[3]

The likelihood of confusion inquiry assesses whether a "'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). Courts in the Ninth Circuit consider eight factors in determining the likelihood of confusion: (a) strength of the mark, (b) proximity of the goods, (c) similarity of the marks, (d) evidence of actual confusion, (e) marketing channels used, (f) type of goods and the degree of care likely to be exercised by the purchaser, (g) defendant's intent in selecting the mark; and (h) likelihood of

---

[3] The Court analyzes Sunsauce's Lanham Act, common law copyright, and UCL claims together because all turn on the same test for trademark infringement. *Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 998 F. Supp. 2d 890, 897–98 (C.D. Cal. 2014); *New W. Corp. v. NYM Co. of California*, 595 F.2d 1194, 1201 (9th Cir. 1979) ("The courts have uniformly held that common law and statutory trade-mark infringements are merely specific aspects of unfair competition."); *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir.1994) ("This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act.").

United States District Court
Northern District of California

expansion of the product line. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979).

These factors are a heuristic device and "must be applied in a flexible fashion." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012). The ultimate question is whether there is a likelihood of confusion, and that "determination may rest on only those factors that are most pertinent to the particular case before the court." *Id.*; *see also Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005) ("The test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them."); *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999) (describing the test as "pliant" and emphasizing that "it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors"); *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 718 (9th Cir. 2024) (internal citations omitted) ("These factors are 'not a rote checklist,' and we must be flexible when analyzing them. Depending on the circumstances of a given case, certain factors may be more important than others.").

The Ninth Circuit has "cautioned that district courts should grant summary judgment motions regarding the likelihood of confusion sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record." *Rearden LLC*, 683 F.3d at 1210 (quoting *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901–02 (9th Cir. 2002)). Summary judgment is appropriate, however, where the Court assesses the relevant factors and determines that the plaintiff has not provided sufficient evidence for a jury to find that a reasonably prudent consumer would likely be confused about the origin of the good. *See, e.g.*, *Lerner & Rowe PC*, 119 F.4th at 726.

## ANALYSIS

**I.  Son Fish Sauce is entitled to summary judgment on Sunsauce's trademark infringement claims because there is no genuine dispute as to the likelihood of confusion.**

This is one of the rare cases where summary judgment with respect to the likelihood of confusion is appropriate. The specific, concrete facts bearing upon the Court's analysis are

undisputed on the record before the Court, and the Court must simply apply the *Sleekcraft* analysis to those facts. For the reasons explained below, when the *Sleekcraft* factors are properly considered, no reasonable jury could find that consumers are likely to confuse the products marketed by Son Fish Sauce with those of Sunsauce.

### A. Strength of the mark

The strength of a mark is measured "both conceptually—by its 'inherent distinctiveness'—and commercially—by its 'actual marketplace recognition.'" *Lerner & Rowe PC*, 119 F.4th at 719 (internal citation omitted). There are five categories of conceptual strength, in order of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

Both arbitrary and fanciful marks have no intrinsic connection to the product the mark represents; the former use words commonly used in the English language, while the latter are entirely made up. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 150 (9th Cir. 1963). Arbitrary and fanciful marks are both "inherently distinctive" and thus "afforded the widest ambit of protection from infringing uses." *Sleekcraft Boats*, 599 F.2d at 349.

A suggestive mark "does not describe the product's features, but suggests them," *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1142 (9th Cir. 2002), "requir[ing] consumers to exercise some imagination to associate the suggestive mark with the product," *Lodestar Anstalt v. Bacardi & Co.*, 31 F.4th 1228, 1258 (9th Cir. 2022) (quoting *JL Beverage Co. v. Jim Bean Brands Co.*, 828 F. 3d 1098, 1107 (9th Cir. 2016)). A suggestive mark is presumptively weak. *Brookfield Commc'ns, Inc.*, 174 F.3d at 1058. Descriptive marks "directly describe the quality or features of the product." *Id.* at 1058 n.19. They are entitled to protection only if secondary meaning is shown. *Sleekcraft Boats*, 599 F.2d at 349. Generic marks merely "identify the product, rather than the product's source" and receive no protection. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005). But "[e]ven when a mark is not inherently distinctive, commercial strength—'extensive advertising, length of exclusive use, public recognition'— can compensate for its conceptual weakness." *Lerner & Rowe PC*, 119 F.4th at 719 (quoting *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991)).

1  Sunsauce's mark is at least suggestive and possibly arbitrary. Because "sun" does not
2  actually describe Sunsauce's sauces in any literal, descriptive sense, the mark "SUNSAUCE"
3  requires a "mental leap" that indicates at least suggestiveness. The term "sauce" probably retains
4  enough of an intrinsic connection to Sunsauce's products, which are sauces, to make it suggestive.
5  But if that intrinsic connection is too attenuated to make it suggestive, the mark is arbitrary, as it
6  combines two common English words.

7  Even if Sunsauce's mark is arbitrary, however, its commercial dilution could make it
8  weaker than most such marks. "[A] mark which is hemmed in on all sides by similar marks on
9  similar goods cannot be very 'distinctive'. It is merely one of a crowd of marks. In such a crowd,
10 customers will not likely be confused between any two of the crowd and may have learned to
11 carefully pick out one from the other." *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856
12 F.2d 1445, 1449 (9th Cir. 1988); *see also Matrix Motors Co., Inc. v. Toyota Jidosha Kabushiki*
13 *Kaisha*, 290 F. Supp. 2d 1083, 1091 (C.D. Cal 2003) (cleaned up) ("[A]n arbitrary mark may be
14 classified as weak where there has been extensive third party use of similar marks on similar
15 goods.").

16 Several factors suggest that Sunsauce's mark is weak and subject to commercial dilution.
17 First, Sunsauce's presence in the U.S. market has been extraordinarily minimal. It is undisputed
18 that Sunsauce did not directly sell its products in the U.S. before 2019 and that from 2019 to 2023
19 Sunsauce's total U.S. sales of all products amounted to less than $5,000 and quite possibly
20 substantially less. Its total advertising and marketing expenditures in the U.S. between 2013 and
21 2023 were only $272.28. Second, Son Fish Sauce has provided evidence of extensive third-party
22 use of marks for sauces that include the word "sun," including 61 live registrations in the USPTO
23 database of marks containing the words "sun" and "sauces." Dkt. No. 68-3, at 10–11.

24 Sunsauce's extremely limited presence in the U.S. market, combined with the abundance
25 of other food products, including sauces, that contain the word "sun" in their marks, makes it
26 "reasonable to infer … that purchasers have been conditioned to expect different sources for
27 [these] goods or … even though such goods … might be deemed sufficiently related to be
28 attributable to a single source under an uncommonly used mark." *Nat'l Cable Television Ass'n v.*

7

1   *Am. Cinema Editors, Inc.,* 937 F.2d 1572, 1579 (Fed. Cir. 1991). The strength of the mark factor is
2   therefore either neutral or weighs against a finding of likely confusion.

3   **B. Relatedness**

4   The relatedness factor looks to the proximity of the goods in the market. "Related goods
5   are those products which would be reasonably thought by the buying public to come from the
6   same source if sold under the same mark." *Entrepreneur Media, Inc.*, 279 F.3d at 1147. "For
7   related goods, the danger presented is that the public will mistakenly assume there is an
8   association between the producers of the related goods, though no such association exists."
9   *Sleekcraft Boats*, 599 F.2d at 350. Factors that bear upon relatedness include "whether the
10  products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use
11  and function." *Network Automation, Inc.,* 638 F.3d at 1150. Generally, products in the same
12  industry are related. *See Brookfield Commc'ns, Inc.*, 174 F.3d at 1056 (holding that a video rental
13  store chain and an entertainment-industry-information provider are related); *Fleischmann
14  Distilling Corp.*, 314 F.2d 149 (holding that whiskey and beer are related); *Aunt Jemima Mills Co.
15  v. Rigney & Co.*, 247 F. 407 (2d Cir. 1917) (holding that pancake syrup and pancake flour are
16  related).

17  Although Son Fish Sauce seeks to emphasize the unrelatedness of parties' products by
18  describing them at a high level of specificity—as Thai suki sauce and Vietnamese fish sauce,
19  respectively—a finding of relatedness does not require this degree of similarity. Both parties'
20  products are not merely food products but, specifically, East Asian sauces. If sold under the same
21  mark, a consumer would reasonably assume they came from the same source. This factor thus
22  weighs in favor of a finding of likely confusion, although less strongly than it would if both
23  parties' products involved the same sauces or cuisine.

24  **C. Similarity of the marks**

25  The similarity of the marks is always an important factor in the likelihood of confusion
26  analysis. *Brookfield Commc'ns*, 174 F.3d at 1054. "Where the two marks are entirely dissimilar,
27  there is no likelihood of confusion." *Lerner & Rowe PC*, 119 F.4th at 726 (quoting *Brookfield
28  Commc'ns*, 174 F.3d at 1054). The "[s]imilarity of the marks is tested on three levels: sight, sound,

8

1  and meaning …. Each must be considered as they are encountered in the marketplace." *Sleekcraft*
2  *Boats*, 599 F.2d at 351 (internal citation omitted).
3      Visually, the marks are as follows:









15      Parties' marks are largely dissimilar. They are visually dissimilar, as they use different
16  spellings, spacing, capitalization, fonts, and stylization. Sunsauce's mark includes a Thai word as
17  well as the English word "SUNSAUCE," while Son Fish Sauce's mark is entirely in English. The
18  packaging, product label, and bottle designs look different. The meanings of the marks are also
19  dissimilar, as "sun" and "son" have entirely different meanings in English.
20      The sound of the marks, however, is identical in English. For marks on products that tend
21  to be purchased over the phone or are primarily advertised by radio, aural similarity is important.
22  But that is not the case here. Sunsauce alleges that it advertises its product by radio, but it does not
23  specifically allege that it does so in the U.S., and the evidence it offers in support is limited to
24  three YouTube links, in Thai, one of which is a video, that are more than a decade old. Both
25  parties' products are purchased in stores and online, contexts in which aural similarity is of limited
26  significance.
27      Given the dissimilarity of the marks' appearance and meaning and the relative
28  unimportance of the marks' similar sound, this factor weighs against a finding of likely confusion.

**D. Evidence of actual confusion**

Evidence of actual confusion among consumers can provide strong support for finding a likelihood of confusion. *Sleekcraft Boats*, 599 F.2d at 352; *Lerner & Rowe PC*, 119 F.4th at 719. But because evidence of actual confusion can be difficult to gather, "the absence of such evidence is not dispositive." *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993).

Here, Sunsauce does not allege that there has been any actual confusion. This factor thus weighs against a finding of likely confusion.

**E. Marketing channels**

Confusion is more likely when products are sold through the same marketing channels. *Sleekcraft Boats*, 599 F.2d at 353; *see also* 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 24:51 ("If the goods of one party are sold to one class of buyers in a different marketing context than the goods of another seller, the likelihood that a single group of buyers will be confused by similar trademarks is less than if both parties sold their goods through the same channel of distribution."). Where products are sold in different stores and to different customers, there is less likelihood of confusion. *See, e.g.*, *Paul Sachs Originals Co. v. Sachs*, 325 F.2d 212, 215 (9th Cir. 1963) (affirming district court's holding that there was no likelihood of confusion where dresses were sold in different stores to customers of different sizes).

Sunsauce contends that the parties' products are sold through similar marketing channels because the *types* of sauces sold by Sunsauce are generally sold in stores near the *types* of sauces sold by Son Fish Sauce, and because both parties use the internet to sell their products. But the marketing channel inquiry concerns parties' actual products, not the general categories to which they belong. *See, e.g.*, *Paul Sachs Originals Co.*, 325 F.2d at 214–15; *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151–52 (9th Cir. 2002); *Surfvivor*, 406 F.3d at 633–34. Given the very limited presence of Sunsauce's products in the U.S. market, there is little evidence to suggest meaningful overlap in the channels of distribution for parties' products. And while both parties also sell their products through internet websites, those websites tend to prominently feature text and images, such that the similarity of the marks is weakest in the marketing channels where the parties' products are most likely to overlap. This factor thus also weighs against a finding of likely

10

confusion.

### F. Typical buyer

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Sleekcraft Boats*, 599 F.2d at 353. Confusion is less likely where buyers can be expected to exercise greater care, as when the typical buyer of a product tends to have special expertise in the field or the goods are expensive. *Id.*; *Lerner & Rowe PC*, 119 F.4th at 722 ("Sophisticated consumers and those shopping for high-value products are likely to exercise a higher degree of care.").

The parties disagree about the level of care likely to be exercised by the typical buyer of their products. Sunsauce argues that the typical consumer of parties' products is an unsophisticated buyer unlikely to exercise special care. According to Sunsauce, both parties' products are inexpensive East Asian sauces targeted at unskilled purchasers who may have only heard the names of the product spoken. Dkt. No. 74, at 19–20. Son Fish Sauce contends that the reasonably prudent purchaser of the sauces in question "would be a consumer looking for an ethnic product, either a Thai product or a Vietnamese product, [who] would not confuse the two, especially if the products are either suki sauce or fish sauce." Dkt. No. 76, at 21.

Neither party offers any factual evidence to support its allegations about their respective customers. There is therefore a genuine dispute as to this factor and it does not weigh for or against a finding of likely confusion.

### G. Intent

An alleged infringer's intent to trade off a mark owner's good will weighs in favor of likelihood of confusion. If a party deliberately selects its mark with the intent to "obtain some advantage from the good will, good name, and good trade which another has built up," this factor carries significant weight in the likelihood of confusion analysis because "the very act of the adopter has indicated that he expects confusion." *Fleischmann Distilling Corp.*, 314 F.2d at 158; *see also Brookfield*, 174 F.3d at 1059 ("An inference of confusion has ... been deemed appropriate where a mark is adopted with the intent to deceive the public."). "When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public."

11

*Off. Airline Guides, Inc*, 6 F.3d at 1394. Courts will also presume that that "the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft Boats*, 599 F.2d at 354. But this presumption can be rebutted by evidence that the alleged infringer believed confusion was not likely. *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1085 (9th Cir. 2005); *TPW Mgmt., LLC v. Yelp Inc.*, No. 16-CV-03063-YGR, 2016 WL 6216879, at *9 (N.D. Cal. Oct. 25, 2016).

It is undisputed that Son Fish Sauce had no knowledge of Sunsauce's mark when it designed its own mark. It only learned of Sunsauce's mark in September 2020 after it submitted a registration application to the USPTO and was informed about Sunsauce's mark. It is also undisputed, however, that Son Fish Sauce continued using its mark after it became aware of Sunsauce's mark. Although continued use does not fall within the plain meaning of the word "adopt," "an alleged infringer's failure to take remedial steps when faced with evidence of confusion" weighs in favor of a finding of likely confusion. *Lerner & Rowe PC*, 119 F.4th at 726. In this case, however, Sun Fish Sauce was never presented with evidence of actual consumer confusion, and after the USPTO notified Son Fish Sauce of a likelihood of confusion, Son Fish Sauce "engaged in a thorough review of Plaintiff's products and its use of the 'SUNSAUCE' mark in the United States" and concluded that Sunsauce had abandoned the use of its mark in the U.S. for the products listed on its registration. Dkt. No. 46-2, at 3.

Under these circumstances, there is no evidence that Son Fish Sauce intended to trade off Sunsauce's good will or good name either at the time it initially adopted its mark or after it learned of Sunsauce's trademark registration. This factor thus weighs against a finding of likely confusion.

**H. Likelihood of expansion**

The likely expansion of a product line is relevant under *Sleekcraft* because the likelihood of confusion analysis is forward-looking and considers how an ordinary consumer would understand a product in the future. "[A] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft Boats*, 599 F.2d at 354.

There is little evidence to support Sunsauce's assertion that it is likely to expand its

business in ways that will lead to direct competition with Son Fish Sauce. While Sunsauce expresses "a desire to expand into Defendant's only product line," Dkt. No. 74, at 22, a mere desire to expand is not sufficient to show expansion is likely, *Surfvivor*, 406 F.3d at 634. Sunsauce has no offices or employees in the U.S. and no contracts or agreements with any U.S. retailers to sell its products in the U.S. Dkt. No. 66, at 22. Between 2013 and 2023 Sunsauce attended no trade shows in the U.S. *Id.* From 2019 to 2023, Sunsauce's total U.S. sales of all its products amounted to less than $5,000. Dkt. No. 66-3, at 7–8. While Sunsauce did begin selling fish sauce in the U.S. in December 2022 (after the filing of this action), it sold only two boxes of twelve bottles each between 2022 and 2023. *Id.* at 9. In March 2023, Sunsauce deleted fish sauce, along with several other sauces, from its registration. Dkt. No. 76, at 11. Sunsauce's actions are inconsistent with any likelihood of expansion into the U.S. fish sauce market. This factor thus also weighs against a finding of likely confusion.

### I. Conclusion

Based on the undisputed facts, no reasonable jury could find that consumers would likely confuse the parties' products and marks. The marks are largely dissimilar. Although they sound the same, they look very different, and there is no reason to give particular weight to aural similarity here. Consumers are most likely to encounter parties' products online or in stores where the distinct spellings, fonts, and stylization of the marks, as well as the dissimilar packaging and labels of the products, make confusion unlikely. *See, e.g.*, *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 997 (C.D. Cal. 2002) (holding that products' packaging, and the presentation of the marks on their labels, make the marks visually dissimilar and minimize the likelihood of consumer confusion). And where marks are dissimilar, the *Sleekcraft* factors that arguably favor Sunsauce carry little weight. *See Lerner & Rowe PC*, 119 F.4th at 726. A reasonably prudent consumer is not likely to confuse dissimilar marks, whether or not they exercise special care or the goods are closely related. The unlikeliness of confusion is further indicated by Sunsauce's negligible presence in the U.S. market, which diminishes the strength of its mark, especially given the number of similar products sold under similar marks, and strongly suggests that Son Fish Sauce did not attempt to trade off Sunsauce's good will by continuing to use its own mark after learning

13

of Sunsauce's mark. It also means that parties' products are not sold through meaningfully overlapping marketing channels. Additionally, there is little evidence that Sunsauce is likely to expand its business such that confusion is likely in the future.

Accordingly, while the identical sound of the marks and relatedness of the products create some potential for consumer confusion, when balanced against the visual dissimilarity of the marks and the multiple other *Sleekcraft* factors strongly indicating confusion is unlikely, the undisputed facts could not support a finding of likelihood of confusion. *See Glow Indus., Inc.*, 252 F. Supp. 2d 962; *Surfvivor Media, Inc.,* 406 F.3d 625; *Lerner & Rowe PC*, 119 F.4th 711. Sunsauce's trademark infringement claims therefore fail on the likelihood of confusion element, and the Court grants Son Fish Sauce's motion for summary judgment as to each of Sunsauce's claims and denies Sunsauce's motion for summary judgment as to those claims.[4]

**II.    Son Fish Sauce is not entitled to summary judgment on its counterclaims because there is a genuine factual dispute regarding the validity of the '095 registration.**

Son Fish Sauce challenges the validity of Sunsauce's registration of the SUNSAUCE mark on two grounds: (1) lack of bona fide intent to use the mark in commerce, rendering the registration void ab initio; and (2) fraudulent misrepresentation, which can serve as a ground for cancellation. Both cancellation and a finding that the registration is void ab initio have the effect of terminating the registration owner's "entitle[ment] to the rights that flow from federal registration, including the presumption that the mark is valid." *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013).

**A.  Bona fide intent**

To register a trademark under federal law, the applicant must have a bona fide intent to use the mark in commerce. 15 U.S.C. § 1141f(a) ("A request for extension of protection of an international registration to the United States … shall be deemed to be properly filed in the United States if such request … has attached to it a declaration of bona fide intention to use the mark in commerce."); *see also* 15 U.S.C. § 1051. If a court finds that a trademark applicant lacked

---

[4] Because the Court finds no likelihood of confusion, it need not decide whether Sunsauce has a protectible interest in the mark.

14

a bona fide intent to use the mark in commerce at the time of registration, the registration is void ab initio and confers no priority on the registered mark holder. *Bobosky v. Adidas AG*, 843 F. Supp.2d 1134, 1140 (D. Or. 2011) ("Lack of bona fide intent to support an intent-to-use application also may render an application void *ab initio* upon challenge in federal district court."); *Caesars World, Inc. v. Milanian,* 247 F. Supp. 2d 1171, 1193 (D. Nev. 2003) (finding intent-to-use application void because it was not made with bona fide intent).

"A determination of whether an applicant has a bona fide intention to use the mark in commerce is an objective determination based on all the circumstances." *L'Oreal S.A. & L'Oreal USA, Inc. v. Marcon*, 102 U.S.P.Q.2d 1434, at *11 (T.T.A.B. 2012). A "firm" intent is required, rather than an intent merely "to reserve a right in the mark." *M.Z. Berger & Co. v. Swatch AG*, 787 F.3d 1368, 1376 (Fed. Cir. 2015). An applicant must establish intent by "real life facts measured by the actions of the applicant, not by the applicant's later arguments about [its] subjective state of mind." *Intel Corp. v. Emeny*, No. 91123312, 2007 WL 1520948, at *5 (T.T.A.B. May 15, 2007). The applicant must show "both actual intent to use the mark in commerce and evidence that objectively demonstrates such an intent." *Bobosky*, 843 F. Supp.2d at 1140; *see also Intel Corp*, 2007 WL 1520948, at *5 ("[W]here an applicant has no documentation evidencing his plans to use the mark on the goods or services claimed, such an absence of clear, objective evidence is sufficient for an opposer to prove that the applicant lacked the requisite *bona fide* intention, unless the applicant can outweigh that absence with an adequate explanation of why no such documentation exists."). Unless an applicant has an adequate explanation for a lack of documentation supporting a claimed intent to use a mark in commerce, "the absence of any documentary evidence on the part of an applicant regarding such intent is sufficient to prove that the applicant lacks a bona fide intention to use its mark in commerce." *Commodore Electronics Ltd. v. CBM Kabushiki Kaisha*, 26 U.S.P.Q.2d 1503, at *5 (T.T.A.B. 1993). Given that the question of "intent is a highly fact-specific inquiry," it is "not generally suitable for disposition on summary judgment." *Fanucchi & Limi Farms v. United Agri Prod.*, 414 F.3d 1075, 1082 (9th Cir. 2005).

Son Fish Sauce alleges that Sunsauce lacked a bona fide intent to use its mark in commerce at the time of its registration, arguing that Sunsauce's list of goods in its application, which included all sauces "except salad dressing; condiments; and flavorings" was overly broad; that Sunsauce lacked business plans, business contacts, potential partners, and suppliers in the U.S.; and that Sunsauce has offered no proof of marketing or advertising in the U.S. at the time of its application. Dkt. No. 76, at 8. Son Fish Sauce also cites Sunsauce's minimal sales in the U.S., which totaled less than $5,000 from 2019 to 2023 and included only $12 in sales of fish sauce.[5] *Id.* at 9; Dkt. No. 66-3, at 9, 11; Dkt. No. 66-4, at 2.

Sunsauce offers as evidence of its bona fide intent to sell its products in the U.S. its knowledge, as early as 2015, that third parties resold its products in the U.S.; its use of English words in its mark and packaging; and the $272.28 it spent on marketing in the U.S. in 2022. Dkt. No. 77, at 5–6; Dkt. No. 77-2, at 2–3. Sunsauce concedes that it did not have a business plan but maintains that a business plan is not necessary to show intent. Dkt. No. 77, at 5–6.

While Son Fish Sauce's evidence certainly calls into question Sunsauce's bona fide intent to use its mark in commerce in the U.S., Sunsauce's evidence in support of its intent is sufficient to establish a genuine dispute of material fact as to its intent. The question of Sunsauce's bona fide intent is thus inappropriate for summary judgment.

**B. Fraudulent misrepresentation**

The Lanham Act permits cancellation of a U.S. Trademark registration at any time if the registration was obtained fraudulently. 15 U.S.C. § 1064(3); *see also* 15 U.S.C. § 1119 (authorizing courts to order the cancellation of trademark registrations). Fraud requires the following elements: (1) "a false representation regarding a material fact"; (2) "the registrant's knowledge or belief that the representation is false"; (3) "the intent to induce reliance upon the misrepresentation"; (4) "reasonable reliance" on the misrepresentation; and (5) "damages proximately resulting from the reliance." *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir.

---

[5] Son Fish Sauce also notes that Sunsauce provides no evidence at all of direct sales to anyone in the U.S. during this period; instead, the sales revenue Sunsauce reports reflects sales to a Thailand-based distribution company that may or may not have sold the products to consumers in the U.S. Dkt. No. 76, at 9.

16

1990).

Overstating the extent of a mark's use can constitute fraud. *See, e.g.*, *First Int'l Servs. Corp. v. Chuckles, Inc.*, 5 U.S.P.Q.2d 1628 (T.T.A.B 1988) (finding fraud where the mark was not used on all of the goods identified in the application). Correcting an overstatement is not enough to rectify fraud. *See*, *e.g.*, *Medinol Ltd. v. Neuro Vasx., Inc.*, 67 U.S.P.Q.2d 1205 (T.T.A.B. 2003) ("[D]eletion of the goods upon which the mark has not yet been used does not remedy an alleged fraud …. If fraud can be shown in the procurement of a registration, the entire resulting registration is void.").

Son Fish Sauce asserts that Sunsauce committed fraud because, on its 2019 Declaration of Use and Incontestability under Sections 8 and 15, Sunsauce stated that its mark was used on several different sauces, including fish sauce, that it did not sell in the U.S. Dkt. No. 66, at 26–27. Son Fish Sauce offers the declarations of business professionals engaged in the sale and distribution of Asian sauces in the U.S. who state that they have never heard of Sunsauce's products, as well the declaration of an individual who spoke to employees and managers at the largest Thai food and restaurant retailer in the U.S. who had never heard of or sold Sunsauce's products. Dkt. No. 46-3, at 2–3; Dkt. No. 46-4, at 2–3; Dkt. No. 66-5, at 2–3. Son Fish Sauce also contends that Sunsauce's deletion of all but two of the sauces from its 2023 Declaration of Use and Renewal, filed two months after Son Fish Sauce's counter-complaint in this case, is evidence of its earlier fraud. Dkt. No. 76, at 10–11. As a result of its fraudulent misrepresentation in 2019, Son Fish Sauce argues, Sunsauce's registration should be cancelled.

Sunsauce concedes that it did not directly sell fish sauce in the U.S. until December 2022, three years after filing the declaration attesting that its mark was in use for fish sauce. Dkt. No. 74, at 30. Sunsauce nonetheless maintains that it had a reasonable belief that its products were in commerce in the U.S. through indirect distribution through third parties. Dkt. No. 74, at 30. It also claims to have relied in good faith on counsel's misleading advice that not every specific good claimed in the Declaration of Use had to be in use at the time of filing. *Id.* at 31–31. As a result, Sunsauce contends that it did not believe its representations were false, a necessary element of fraud. *See Robi*, 918 F.2d at 1444.

Sunsauce's evidence is sufficient to create a genuine dispute with respect to Sunsauce's knowledge that any representations on its 2019 Declaration of Use and Incontestability were false. While Son Fish Sauce cites *Medinol v. Vasx, Inc.* for the proposition that fraud in the procurement of a trademark registration is present if a party knew *or should have known* that its statement of use was materially inaccurate, 67 U.S.P.Q.2d 1205, at *6 (T.T.A.B. 2003), the Ninth Circuit has declined to adopt the looser knowledge standard of *Medinol* and instead requires actual knowledge. *See The Learning Internet v. Learn.com, Inc.*, No. CV 07-227-AC, 2009 WL 6059550 (D. Or. Nov. 25, 2009), *report and recommendation adopted*, No. CV 07-227-AC, 2010 WL 1141351 (D. Or. Mar. 18, 2010) (noting that the Ninth Circuit had not adopted the *Medinol* standard); *Levi Strauss & Co. v. Esprit U.S. Distrib. Ltd.,* 588 F.Supp.2d 1076, 1083–84 (N.D. Cal. 2008) (quoting *Robi,* 918 F.3d at 1444) ("When a party asserts a claim for fraud on the PTO, it must prove … 'the registrant's knowledge or belief that the representation is false.'"). Under that standard, the record before the Court does not establish beyond dispute that Sunsauce was aware of the falsity of its registration statements. As such, summary judgment on this claim is inappropriate.

## CONCLUSION

For the foregoing reasons, the Court grants Son Fish Sauce's motion for summary judgment as to Sunsauce's claims, denies it as to Son Fish Sauce's counterclaims, and denies Sunsauce's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: December 2, 2024

_____
P. Casey Pitts
United States District Judge

18